IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>WAL-MART STORES, INC.,<br><br>Defendant. | CIVIL ACTION NO.:<br>8:04-CV-01862-SDM-MSS |

**PLAINTIFF EEOC'S RESPONSE IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, the U.S. Equal Employment Opportunity Commission ("EEOC" or the "Commission"), hereby submits this response in opposition to Defendant's Wal-Mart Stores, Inc's. ("Wal-Mart" or "Defendant") Partial Motion for Summary Judgment. The EEOC filed this lawsuit on August 12, 2004, to correct unlawful employment practices on the basis of sex, and to provide appropriate relief to Virginia Rylance ("Mrs. Rylance") and Linda Gliotti ("Ms. Gliotti") who were subjected to egregious, highly offensive, verbal and physical sexual harassment hostile work environment, which persisted despite their repeated pleas to Wal-Mart's management. Defendant files the instant partial motion for summary judgment in an effort to avoid defending the case on its merits and to limit its monetary liability for the egregious sexual harassment it permitted to be perpetrated upon two (2) of its female employees. As detailed herein, Defendant's summary judgment motion is legally and factually deficient. Further, the record in this case contains genuine issues of material fact which preclude granting Defendant's Motion For Summary Judgment.

I.      **The Defendant Does Not Meet the Standard for Summary Judgment**

A party moving for summary judgment must show that there is no genuine issue **as to any material fact**, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)(emphasis added). A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record, "which it believes demonstrate the absence of a genuine issue of material fact." Id. Defendant has not carried its burden in this regard. The trial court should grant summary judgment only if there can be a single reasonable conclusion as to the verdict. Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505 (1986). The court "must consider all the evidence in the light most favorable to the non-moving party." Rollins v. Tech South, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987). It must resolve all reasonable doubts in favor of the non-moving party. Barnes v. Southwest Forest Industries, Inc., 814 F.2d 607, 609 (11th Cir. 1987).

II.     **Statement of the Case**

The violations in this case occurred at Defendant's Super Center located in Bradenton, Florida, known as Store #528, a Wal-Mart with over 500 employees. Claimant Linda Gliotti began her employment at Wal-Mart Store #528 on or about April 7, 1997 as a Price Verification Associate. (Gliotti dep. p. 16; 25).[1] Claimant Virginia Rylance began her employment at Wal-Mart Store #528 on or about April, 2001 as an overnight Cashier. (Rylance dep. p. 21-22). On or about October 7, 1998, Defendant hired Sean Dolan ("Dolan") as a stocker in the chemicals department for Store #528. Defendant quickly promoted Dolan to Lead Associate/Grocery Crew Chief in the grocery

---

[1] Citations to deposition transcripts will appear by last name of deponent followed by page citation.

department on December 30, 1998. (Exhibit A). Thereafter, Defendant continued to promote Dolan through the ranks. First, to Grocery Department Manager on July 8, 2000; then to Electronics Department Manager on May 5, 2001; and lastly to Grocery Support Manager on August 31, 2002. (Composite Exhibit B). The Grocery Support Manager position is a higher level position than that of department manager and a position that places an individual in line for promotion to Assistant Manager of the Store. (Klein dep p. 49-51).

During late 2001, Dolan began subjecting claimant Gliotti to sexual harassment. (Gliotti dep p. 84-85). Despite her protests and requests for him to stop, Dolan on a daily basis would grab Ms. Gliotti's buttocks and vaginal area. (Gliotti dep p. 84-93). Dolan would also call attention to his erect penis showing through his pants and would tell Ms. Gliotti "look, this is what you do to me". (Gliotti dep p. 88-92). This sexually offensive conduct continued throughout 2002 and through the beginning of 2003. When the conduct first began back in 2001, Gliotti reported to Store Co-Manager Derek Boswell (2nd in chain of command under then Store Manager Larry Dollar) that Dolan had come up to her on the job unexpectedly and kissed her. (Gliotti dep p. 96) When the sexual harassment intensified and Dolan refused to stop his behavior despite Ms. Gliotti's protest, Ms Gliotti, in early 2002, reported Dolan's unwelcome sexual conduct, to her supervisor and Assistant Store Manager Kevin Paul, including the fact that Dolan had exposed his penis. (Gliotti dep p. 96-99 ). Paul told Ms. Gliotti that he would take care of it. (Gliotti dep p. 99).[2] However, the

---

[2] Paul testified that he received a complaint by Gliotti in January 2002 regarding inappropriate comments made by Sean Dolan to her; and that he took the complaint to Store Manager Dennie Stephens. (Paul dep. 83-87). Paul turned it over to Stephens because it was his duty to conduct an investigation but he does not know whether Stephens ever did or not. Instead on August 21, 2002, Dolan receives an "exceeds expectations" on his performance appraisal from Store Manager Stephens. (Exhibit C).

sexual harassment continued.

During most of the same time frame Dolan was engaging in egregious sexual harassment of Ms. Gliotti, he was also sexually harassing claimant Virginia Rylance. Dolan, on a frequent basis, would grab Mrs. Rylance's breasts, buttocks or vaginal area. (Rylance dep. p. 68 ). On one occasion, he also planted a kiss on Mrs. Rylance's lips. (Rylance dep. p. 62). On another occasion, he attempted to pull her into a "steel" room on the premises. (Rylance dep. p. 68-69 ). On one occasion, while Mrs. Rylance was at the managers' work station, Dolan came up to her, touched her shoulder and when she turned around he pointed to his erect penis, visible through his clothes, and stated "look at what you do to me". (Rylance dep. p. 66). On yet another occasion, he tried to expose himself to her. (Rylance dep. p. 67). Dolan would also make comments to Mrs. Rylance such as "when are you going to take me home and rape me". (Rylance dep. p. 64).

On three separate occasions, once in 2001 and twice in 2002, Mrs. Rylance complained to her supervisor and Assistant Store Manager Mark Klein about Dolan's persistent sexual harassment, including the fact that he was grabbing her buttocks and vaginal area. (Rylance dep. p. 71-75). On the last occasion, Mrs. Rylance went into the Assistant Manager's office and complained to Klein in front of another Assistant Manager Charles Morris that Dolan was trying to expose himself to her in one of the offices. (Rylance dep. p. 74-75). Klein shook his head and stated to Charles Morris "you have got to hear what is happening to this girl"; and Charles Morris laughed. (Rylance dep. p. 74-75). On another day in 2002, Mrs. Rylance was sitting visibly upset in the break room, when Department Manager Denise Maxwell asked her what was wrong, Mrs. Rylance again reported the fact that Dolan would not stop sexually harassing her. (Rylance dep. p. 76). In response, Department Manager Maxwell went to Department Manager Dave Thompson and asked him to tell Dolan to stop

touching Mrs. Rylance. (Maxwell dep. p. 36-42). Dave Thompson, in turn, asked Department Manager Jason Reck to counsel Dolan to stop his unwelcome conduct. These actions only caused Dolan to corner Mrs. Rylance by the time clock on the premises and confront her about "why she was trying to get him fired." (Rylance dep. p. 76-77).

On January 16, 2003, Mrs. Rylance, in tears, went to Store Manager Dennie Stephens. (Rylance dep. p. 78-80). Even though Mrs. Rylance was visibly upset, the Store Manager asked Mrs. Rylance to wait as he was going to meet with someone else he had just paged to his office. Mrs. Rylance upset and extremely distraught walked off of the job, after talking to two other managers. (Rylance dep. p. 79-80). On January 18, 2003, Mrs. Rylance came back in the store and met with Dennie Stephens and relayed to him the sexual harassment she was experiencing and her prior reports to management about it. (Rylance dep. p. 83-89). Stephens took detailed notes of Mrs. Rylance's complaint and facts relayed by her. (Exhibit D). Nonetheless, after Mrs. Rylance left that day, Stephens through Department Manager Maxwell, requested that Mrs. Rylance provide a written statement for him. (Rylance dep. p. 84-86 ). Mrs. Rylance, who was under extreme emotional distress at the time, felt it was unnecessary for her to again reiterate everything in writing as she had just met with Stephens in person and recounted all of the events to him, including her prior notice to management. (Rylance Affidavit). When the statement from Mrs. Rylance was not forthcoming, Stephens asked manager Maxwell to relate to Mrs. Rylance that if she would not provide him this written statement he was going to fire her. (Rylance dep. p. 86), (Maxwell dep. p. 55-56). Dolan was not disciplined and was permitted to continue working at Store #528 for almost two (2) months, until he tendered his voluntary resignation on March 6, 2003. *See* Exhibit E, Dolan's letter of

resignation.[3]

### III. EEOC's Has Standing to Pursue Monetary Claims on Behalf of Ms. Gliotti

In its motion, Defendant argues that EEOC lacks standing to pursue monetary damages on behalf of Ms. Gliotti. Defendant's premise is legally flawed and is based on cases wholly inapplicable to the instant case, an enforcement action brought by the EEOC pursuant to its statutory authority under 706(a) of Title VII, 42 U.S.C. 2000e-5(a). It is well established that the EEOC maintains a right of action independent of the charging party. *See General Telephone Co. v. EEOC,* 446 U.S. 318, 326 (1980)(Title VII's authorization of "private-action rights suggest that the EEOC is not merely a proxy for the victims of employment discrimination"). As a complaining party, the EEOC may bring suit to enjoin an employer from engaging in unlawful employment practices, and to pursue reinstatement, backpay, and compensatory or punitive damages. *EEOC v. Waffle House,* 534 U.S. 279, 287 (2002). Thus, these statutes [Title VII and ADA] unambiguously authorize the EEOC to obtain the relief that it seeks in its complaint if it can prove its case against respondent. *Id.* In *Waffle House*, the Supreme Court held that the EEOC could seek monetary relief for individuals whose claims were barred because each had signed a mandatory arbitration agreement

---

[3] In answers to Interrogatories, Wal-Mart contends Dolan was suspended on February 27, 2003. (Exhibit F, answer to Interrogatory #4). However, nothing in his personnel file indicates any suspension or disciplinary action was taken against him for the sexual harassment he perpetrated against Ms. Gliotti and Mrs. Rylance. Even if he was suspended, this"suspension" was instituted four (4) weeks after Stephens' investigation concluded and almost six (6) weeks after Mrs. Rylance's complaint to the Store Manager on January 18, 2003. (Exhibit F, answer to Interrogatory #5, indicating that Stephens' conducted an "investigation" from January 20 through January 31). There can be no defense for Wal-Mart's lack of response, particularly when the record indicates Dolan had been counseled on November 28, 2001 by the previous Store Manager for sexually harassing a customer. (Exhibit G). And, when another female cashier, Halle Culbreath, gave a statement to the Store Manager on January 31, 2003, indicating that Dolan had lifted up her vest and commented that she "had a nice ass". (Exhibit H).

with his or her employer and refused to stay or dismiss EEOC's lawsuit. *Id.* at 295. The Court found that the statute made "the EEOC the master of its own case" and "conferred on the agency the authority to evaluate the strength of the public interest at stake." *Id.* at 291. The Court further found that "it is the public agency's province - not that of the court - to determine whether public resources should be committed to the recovery of victim-specific relief." *Id.* at 291-92. The Court emphasized that the EEOC may seek "to vindicate a public interest...even when it pursues entirely victim-specific relief." *Id.* at 296. The reasoning in *Waffle House*, makes it clear that the EEOC's right to bring suit seeking individual monetary relief goes beyond that of the individual and reaches the territory of public interest, thereby allowing the EEOC to seek relief for individuals, who could not, for any variety of reasons, do so themselves. Accordingly, there is no basis in law for Defendant's argument that EEOC lacks standing to pursue monetary damages on behalf of Ms. Gliotti in connection with this enforcement action.

Defendant has not cited any case law or provision of the Bankruptcy Code that strips EEOC's standing and authority to prosecute discrimination claims on behalf of charging parties once they have filed bankruptcy. On the contrary, courts that have ruled on this issue have held that an EEOC lawsuit may proceed independent of the bankruptcy action even when a party to the suit files for bankrupt. *See EEOC v. Woodmen of the World Life Ins.,* 2005 WL 2181336 (D. Neb. 2005)(recognizing that a charging party's filing for bankruptcy does not prohibit EEOC from pursuing an enforcement action on her behalf); *EEOC v. Apria Healthcare Group,* 222 F.R.D. 608 (E.D. Mo. 2004)(court denied defendant's motion to dismiss finding that there is no authority for the proposition that the bankruptcy trustee is a necessary party to an EEOC action where the charging party has filed for protection under the Bankruptcy Code); *see also, EEOC v. Rath Packing Co.,* 787

7

F.2d 318, 325-326 (8th Cir.1986)(Eight Circuit held that the automatic stay provision of Sect. 362(a) of the Bankruptcy Code did not apply to a Title VII action brought by the EEOC, seeking relief such as backpay, seniority and interest); *E.E.O.C. v. Hall's Motor Transit Co.,* 789 F.2d 1011, 1014 (3d Cir. 1986).

Indeed, a contrary holding would severely hamper EEOC's statutory obligation to eradicate employment discrimination as EEOC would be limited in bringing actions in cases where the aggrieved individuals filed for bankruptcy. *See Waffle House* at 296. ("We have generally been reluctant to approve rules that jeopardize the EEOC's ability to investigate and select from a broad sample of claims). It would be an unjust result to preclude aggrieved persons who have had to seek relief under the Bankruptcy Code from having the agency with pre-eminent authority in this area, the EEOC, from advancing claims on their behalf and relegating that role to the trustee of the bankruptcy estate, who may not have the resources or expertise of the EEOC.[4] *See EEOC v. Pempco,* 383 F.3rd 1280, 1294 (11th Cir. 2004)( Pemco is trying to bind the EEOC to the adverse result in the suit that it successfully kept the EEOC from participating in. That result would, we think, set a grossly inequitable precedent: it would open the door for defendants to seek to keep the EEOC out of private litigation, and then try to preclude the EEOC -- which may have more resources and effective legal representation, and therefore a better chance of winning at trial, than private plaintiffs do -- from suing on its own.)

Defendant relies on two (2) cases which stand for the proposition that a pre-petition claim is the property of the Chapter 7 bankruptcy estate, and only the trustee in bankruptcy has standing

---

[4] Indeed, in some cases the individual's need to file bankruptcy may be necessitated by the employer's illegal actions that caused a monetary loss.

to pursue it, *Parker v. Wendy's Intern, Inc.* 365 F.3d 1268 (11th Cir. 2004) and *Barger v. City of Cartersville,* 348 F.3d 1289 (11th Cir. 2003).  However, the *Parker* and *Barger* cases are factually and legally distinguishable from the instant case.  *Parker* and *Barger* dealt with individuals attempting to pursue their own claims, in the absence of the trustee, after they had filed petitions for bankruptcy.  These cases are inapplicable to enforcement actions brought by EEOC, the agency of the United States of America charged with the responsibility for enforcing the anti-discrimination statutes. The Supreme Court's *Waffle House* opinion illustrates that the Federal Arbitration Act does not trump the EEOC statutory authority to seek all remedies available in an enforcement action even when the FAA requires the claimant to arbitrate the claim.  Similarly, provisions in the Bankruptcy Code conveying standing to the trustee in a bankruptcy case to prosecute causes of action belonging to the estate, do not trump EEOC's authority to bring an enforcement action seeking whatever relief it deems appropriate, including monetary relief.  Significantly, the Supreme Court in *Waffle House* recognized that once a charge is filed, the EEOC is in command of the process and it need not obtain consent from the charging party to prosecute its case nor to determine its prayer for relief.  *Id.* at 291  The Court further recognized that once the EEOC files suit on its own, the employee has no independent cause of action, although the employee may intervene in the EEOC's suit.  *Id.*

What the relevant case law with respect to EEOC's authority reflects is that the EEOC does not merely "stand in the shoes of individuals" or acts in privity with them as their representative when bringing an enforcement action on their behalf.  As such, the fact that an individual is precluded from litigating his or her own claim and can only do so through the trustee does not preclude the EEOC from bringing suit in its own name and on behalf of the individual seeking all remedies available by statute.  Accordingly, Defendant's partial motion for summary judgment on

9

this basis must be denied.

**IV.     The Doctrine of Judicial Estoppel Does Not Apply To An Enforcement Action Brought By The EEOC In Its Own Name Pursuant to Statute**

Defendant additionally contends that the monetary damages claims EEOC brought on Ms. Gliotti's behalf should be dismissed on judicial estoppel principles based on Ms. Gliotti's failure to disclose the EEOC charge underlying this lawsuit when her bankruptcy petition was filed. However, just as it with its lack of standing argument, Defendant failed to cite any authority to support that this equitable doctrine applies to an enforcement proceeding brought by the EEOC. In fact, *Parker v. Wendy's,* the Eleventh Circuit Case that Defendant relies heavily on in its brief, compels a finding that this doctrine does not apply to the EEOC. In *Parker,* the trustee appealed a decision by the district court finding that judicial estoppel barred the trustee from pursuing the debtors monetary damages claim, when the debtor failed to disclose her employment discrimination lawsuit on her bankruptcy schedules. *Parker v. Wendy's,* 365 F.3d at 1269. On appeal, the Eleventh Circuit reversed the district court's decision finding that the doctrine of judicial estoppel was improperly invoked. *Id.* at 1273. The Eleventh Circuit reasoned that the doctrine of judicial estoppel requires the assertion of inconsistent positions that are "calculated to make a mockery of the judicial system". *Id.* at 1272 (citing *Burnes v. Pemco Aereoplex, Inc.,* 291 F.3d 1282, 1285 (11th Cir. 2002)). However, because the trustee in *Parker* did not assert inconsistent positions, an essential element of judicial estoppel was missing. *Id.* at 1272.

Just as in *Parker,* EEOC was not and is not a party to the bankruptcy and has never asserted inconsistent positions that would warrant imposition of judicial estoppel to its claims in this enforcement action. EEOC has not made any false or inconsistent statement under oath and is not

10

tainted or burdened by Ms. Gliotti's alleged misconduct. *Id.* at 1273; *see also EEOC v. Apria Healthcare Group,* 222 F.R.D. 608 (E.D. Mo. 2004)(court rejected Defendant's contention that monetary damages claims in an EEOC-filed discrimination action may be dismissed on judicial estoppel principles based on the non-party charging party's failure to disclose the underlying administrative charge in the bankruptcy proceedings).

**V.      Assuming Arguendo The Doctrine of Judicial Estoppel Applies, Genuine Issues of Material Fact Remain as to Whether Ms. Gliotti Can Be Found to Have a "Motivation or Intent to Conceal" Her Claim for Sexual Harassment Against Wal-Mart from the Bankruptcy Court**

Even assuming *arguendo* that judicial estoppel could apply to this case, a reasonable fact finder could conclude that Ms. Gliotti <u>did</u> <u>not</u> have any "motivation or intent" to conceal her EEOC charge against Wal-Mart from the bankruptcy court. The Supreme Court in *New Hampshire v. Maine*, 533 U.S. 968, (2001) stated that applying the doctrine of judicial estoppel may not be warranted in cases of mistake or inadvertence. In the Eleventh Circuit, the court generally considers two (2) factors: whether the allegedly inconsistent positions were made under oath and whether the inconsistencies "have been calculated to make a mockery of the judicial system. *Burnes v. Pemco Aereoplex, Inc.,* 291 F.3d 1282, 1284 (11th Cir. 2002). However, these factors "are not inflexible" and courts "must always give due consideration to all of the circumstances of a particular case". *Id.*

All of the cases cited by Defendant where the Eleventh Circuit applied the doctrine of judicial estoppel are factually and procedurally distinguishable from the instant case. The record evidence in this case clearly supports that Ms. Gliotti's actions were not "calculated to make a mockery of the judicial system". The plaintiffs in *Burnes* and *Barger,* failed to disclose pending employment

discrimination *lawsuits* in subsequent bankruptcy proceedings.[5]  *See Burnes* 291 F.3d at 1284; *Barger* 348 F.3d at 1291.  The decisions in *Comcar, Burnes* and *Barger* noted strongly that the debtors in those cases did not even move to reopen their bankruptcy cases until <u>after</u> the defendants raised the issue of judicial estoppel.  *Comcar* at 1292; *Burnes* at 1288; *Barger* at 1297.  Those dispositive facts are not present here.  In the instant case, although Ms. Gliotti failed to initially list her EEOC charge on the bankruptcy schedules as a "pending administrative proceeding", her bankruptcy was reopened during the pendency of the EEOC investigation into her charge.  *See* Defendant's Exhibit L, reflecting motion to reopen the bankruptcy estate was filed on February 5, 2004.  The EEOC had not even issued a finding on Ms. Glotti's charge at the time her bankruptcy was reopened.(Exhibit I, EEOC Letter of Determination dated April 2, 2004, reflecting EEOC mailed out its letter of determination on Ms Gliotti's charge almost two (2) months after the bankruptcy was reopened).  Notably, at no time during this time frame did Ms. Gliotti even have a notice of right to sue from the EEOC, which would have granted her the right to file an action against Wal-Mart.  *See Waffle House,* 534 U.S. at 292 (an employee must obtain a right to sue letter before bringing a complaint in court and if, during that time, the EEOC decides to pursue its own suit, the individual has no independent cause of action).  Ultimately, Ms. Gliotti never obtained a right to sue because EEOC filed this enforcement action under Title VII based on Ms. Gliotti's EEOC charge (and Mrs. Rylance's) on August 12, 2004, six (6) months after Ms. Gliotti's bankruptcy was re-opened.

Moreover, although Defendant asserts that the trustee "discovered" the sexual harassment

---

[5] The plaintiff in *Burnes* originally filed bankruptcy under Chapter 13, but converted it to a Chapter 7 bankruptcy and did not list his employment discrimination lawsuit in his amended schedules filed in connection with his conversion.  *Burnes* at 1284.

claim in an effort to attribute a "motivation to conceal" to Ms. Gliotti, the fact is Ms. Gliotti's then attorneys contacted the trustee on behalf of Ms. Gliotti and informed her that the EEOC charge existed. (Trustee Susan Woodard Affidavit). Unlike the plaintiffs in *Comcar*, *Burnes* and *Barger*, Ms. Gliotti informed the trustee of her charge, the trustee moved to re-open her bankruptcy and the bankruptcy was reopened for the benefit of the creditors, <u>before</u> Ms. Gliotti's right to file a lawsuit ever accrued, before the EEOC filed its Complaint, and over a year before the Defendant ever raised judicial estoppel in EEOC's action. The courts must always give due consideration to all of the circumstances of a particular case when considering the applicability of the judicial estoppel doctrine. *Burnes* 291 F.3d at 1286. Under the factual circumstances here no reasonable person could conclude that Ms. Gliotti "calculated to make a mockery out of the judicial system" or had an "intention" to conceal.[6] *See Taylor v. Comcast Cablevision of Ark Inc*, 252 F.Supp.2d 793, 799 (E.D. Arkansas 2003)(judicial estoppel did not bar discrimination claim absent sufficient evidence of employee's intent to manipulate or deceive judicial system); *American Nat'l Bank of Jacksonville v. Federal Dep. Ins. Corp.*, 710 F.2d 1528, 1536 (11th Cir. 1983) (explaining that judicial estoppel applies to the "calculated assertion" of divergent positions). At the least, there are material issues of fact in dispute in this regard which preclude judgment as a matter of law on this issue.

---

[6] Defendant, based on dicta contained in a footnote in the *Parker* case, also urges this Court to limit any recovery in this action **only** to the amount that would satisfy the creditors in order to prevent an undeserved "windfall" to the "non-disclosing debtor". Based on the facts of this case, Defendant's request is unwarranted and clearly would only serve to grant a "windfall" to Wal-Mart, who would escape monetary liability for its illegal actions towards Ms. Gliotti. It is unlikely the *Parker* court envisioned this application. *See Hosea v. Phelps,* 2005 WL 2181336 (Bankr. M.D. Ga. 2005)(rejecting the defendant's argument for a limited application of judicial estoppel invoked under the dicta in *Parker)*; *Taylor*, 252 F.Supp.2d at 798 (an overly strict application of judicial estoppel has been criticized as providing a windfall to the alleged wrongdoer).

**VI.      Mrs. Rylance's Rejections of Wal-Mart's Two (2) Offers of Re-employment Were Not Unreasonable**

EEOC and Mrs. Rylance admit that she declined two offers made by Wal-Mart for reinstatement on January 28, 2003 and March 12, 2003. However, based on the circumstances in this case, Mrs. Rylance's rejections were reasonable. *See, Ford Motor Co. v. EEOC*, 458 U.S. 219, 241 (1982)(A Title VII claimant's rejection of a defendant's job offer normally ends the defendant's ongoing responsibility for back pay unless "special circumstances" are present). In circumstances where a hostile work environment caused the depression of the plaintiff, it is not unreasonable for the employee to reject the offer of reinstatement. *See Lewis v. Federal Prison Industries, Inc.,* 953 F.2d 1277, 1279 (11th Cir. 1992); *Lathem v. Department of Children and Youth Services,* 172 F.3d 786, 794 (11th Cir. 1999)(holding that a Title VII claimant is entitled to an award of back pay where the defendant's discriminatory conduct caused the disability). In *Lewis,* the Eleventh Circuit found that the employee's refusal to return to work was reasonable when the discrimination caused a depression in the employee. The Eleventh Circuit recognized that under the rule in *Ford Motor* the analysis does not end with a finding that the employer made a good faith unconditional offer of reinstatement, but rather, that the courts must examine the reasons for the rejection of the offer.

In this case, Dolan's continuous overt sexual harassment and management's failure to correct it, led to Mrs. Rylance's constructive discharge and treatment with a mental health practitioner for depression. (Rylance Affidavit; Rylance dep. p. 104). Understandably, Mrs. Rylance's emotional and mental state, fear of contact with the harasser and fear of retaliation by management prevented her from accepting Wal-Mart's offers. When Mrs. Rylance went to the Store Manger on January 16, 2003, after having endured months of egregious sexual harassment by Dolan and after having

14

repeatedly complained to Wal-Mart's assistant managers, the Store Manager basically brushed her off even though she had tears running down her face. Shortly after this, Mrs. Rylance upset and extremely distraught walked off of the job. Nonetheless, she came back to the store two (2) days after and gave a detailed account of the events that had transpired to Store Manager Stephens, including the fact that Dolan had grabbed her breasts and vaginal area, unzipped his pants and attempted to expose himself to her. Stephens' only response was to threaten Mrs. Rylance with termination a couple of days later, through department manager Maxwell, if she did not give an additional written account of the events.

For the weeks following her constructive discharge Mrs. Rylance became very depressed, barely left her house except to take and pick up her kids from the bus stop, could not sleep, was barely eating, and was constantly crying. (Rylance Affidavit). On January 21, 2003, Mrs. Rylance went to Susan McMillan, a licensed mental health practitioner, seeking treatment for her depression. (Rylance Affidavit).[7] Wal-Marts offers of reinstatement were made on January 28, 2003 and March 12, 2003, during the time Mrs. Rylance was experiencing the depression and was under treatment by Ms. Mc Millan. (Rylance Affidavit). Mrs. Rylance stopped her therapy sessions with Mrs. McMillan when she could no longer afford the cost of the visit, $110.[8] (Rylance Affidavit).

In addition to her depression, Mrs. Rylance could not accept Wal-Mart's offers of reinstatement because she was extremely fearful of retaliation and she could not go back to work

---

[7] Although therapist McMillan was listed on EEOC's Answers to Interrogatories on February 2, 2005, Defendant has not taken her deposition to date. Discovery in this cases closes October 31, 2005.

[8] Mrs. Rylance provided insurance for herself and her family through her Wal-Mart benefits. After her constructive discharge, Mrs. Rylance was never provided any COBRA Notice and lost her insurance immediately.

15

while the perpetrator was still working there as a manager. There is no evidence in the record to dispute the fact that Mrs. Rylance, at the time of the offers, was unaware of what, if any action, Wal-Mart had taken with respect to Dolan. Contrary to Defendant's assertion, Mrs. Rylance testified that she did not know what Dolan's status was when she rejected the offers of reinstatement. (Rylance dep. at 92-93). Although at some point Denise Maxwell informed Rylance that Dolan was no longer there, Maxwell testified that she herself did not know Dolan was no longer employed until "someone" came up to her and told her. (Maxwell dep. at 58-59). Significantly, at the time of the first offer which came via letter dated January 28, 2003, ten (10) whole days after Mrs. Rylance had described numerous physical assaults on her person, Wal-Mart did not indicate what, if any action had been taken against the harasser and stated that Wal-Mart was "investigating" and needed to complete their investigation. *See* Defendant's Exhibit 12. Thereafter, Wal-Mart's written offer to Mrs. Rylance's attorney at the time, dated just six (6) days after the harasser voluntarily resigned merely stated Wal-Mart "has taken what we believe to be prompt, effective, and appropriate remedial action" and does not indicate one way or another whether Dolan was disciplined or no longer employed by Wal-Mart. *See* Defendant's Exhibit 13.

Based on the Store Manager's threat to Mrs. Rylance that he would fire her if she did not provide a statement (which she already orally given to him) and her uncertainty as to what if any action Wal-Mart was taking to correct Dolan's behavior, coupled with her distraught and depressed emotional state, it was indeed very reasonable for Mrs. Rylance to reject Wal-Mart's offer of reinstatement. *See Resley v. The Ritz-Carlton,* 989 F. Supp. 1442, 1450 (M.D. Fla. 1997) (court denied defendant's motion for summary judgment with respect to Plaintiff's claim of back pay and benefits finding that a reasonable fact finder could conclude that there were special circumstances

justifying plaintiff's refusal to return to work after she was constructively discharged due to hostile work environment sexual harassment, and that this refusal was reasonable.) Taking all of the facts in this case under consideration, a fact finder could conclude that Mrs. Rylance's rejection of the two (2) offers under these circumstances were reasonable. Accordingly Wal-Mart's partial motion for summary judgment must be denied.

### VII. Mrs. Rylance Did Not Fail to Mitigate Her Damages as Her Mental State Initially Precluded Her from Seeking Employment and Once She Sought Employment No Substantially Equivalent Employment Was Available

The Defendant bears the burden to prove that the plaintiff did not use reasonable diligence to obtain comparable work. *Lathem v. Department of Children and Youth Services,* 172 F.3d 786, 794 (11th Cir. 1999); *Munoz v. Oceanside Resorts*, 223 F.3d 1340, 1345 (11th Cir. 2000). In this case, Defendant has not met its burden. In deposition, Mrs. Rylance testified that she first sought employment almost a year after her constructive discharge. (Rylance dep. p. 18). Prior to that Mrs. Rylance was unable to work due to the depression she experienced as a result of the sexual harassment and constructive discharge.[9] (Rylance Affidavit). For the time that Mrs. Rylance was essentially disabled due to her depression, the mitigation requirement does not apply. *See Lathem,* 172 F.3d at 794. (we hold that the mitigation requirement does not apply to a Title VII plaintiff where the defendant's discriminatory conduct resulted in the disability that prevents the plaintiff from finding other employment).

Once Mrs. Rylance felt better enough to seek employment, she did use reasonable diligence

---

[9] Mrs. Rylance was never asked during deposition why she did not seek employment for almost a year after her constructive discharge. However, she did testify in later questions in her deposition as to the reasons why she sought treatment with Therapist McMillan and she responded that she went for depression and "crying all the time" and for the sexual harassment. (Rylance dep. p. 104).

to find another position but no "comparable" positions to her Wal-Mart position were available. Contrary to Defendant's "undisputed facts", Mrs. Rylance made other efforts to seek employment other than applying at Fish-Camp and Publix. When asked about other efforts to seek employment, Mrs. Rylance testified that she went to other places and they were not hiring so she did not place an application because it was futile. (Rylance dep. 19). When Mrs. Rylance started working at Wal-Mart in 2001, she started working the overnight shift because this shift made it possible for her to drop off and pick up her daughter and son at the bus stop. (Rylance dep. p. 6); (Rylance Affidavit). (Wal-Mart Store #528 is open 24 hours a day). Mrs. Rylance worked the overnight shift for almost a year. (Rylance dep. p. 6). In mid 2002, Mrs. Rylance switched to a day shift schedule of 6:00 A.M. to 2:30 P.M.; she was able to work this shift because she would leave in time to pick up her children at the bust stop at 3:00 P.M.. (Rylance dep. p. 36-37); (Rylance Affidavit).

In an effort to seek "comparable" employment once she was in a mental condition to work, in addition to Fishcamp and Publix, Mrs. Rylance went to nearby Hess Gas station, the 7 -Eleven, and Circle K, as they were the only employers who were open 24 hours and thus could potentially provide the same schedule Wal-Mart had offered Mrs. Rylance. (Rylance Affidavit). When she inquired about positions, she was told they were fully staffed and had no positions available, thus Mrs. Rylance did not fill out an application. The Supreme Court has stated that an unemployed claimant need not go into another line of work, accept a demotion or take a demeaning position. *See Ford Motor* Co. 458 U.S. at 232. Mrs. Rylance sought "comparable" positions to her Wal-Mart position but there were none available. In this case, Defendant has not sustained its burden to establish that Mrs. Rylance failed to mitigate her damages. *See Munoz*, 223 F.3d at 1347. Based on the record evidence, a reasonable jury could find that Mrs. Rylance met her duty under the law to

mitigate her damages.[10] As such, Defendant's partial request for summary judgment should be denied.

## VII. Conclusion

Considering all evidence presented herein in the light most favorable to the Commission, there cannot be a single reasonable conclusion as to the verdict in this case with respect to the issues raised in Defendant's partial motion for summary judgment. Therefore, the EEOC respectfully requests that this Court deny Defendant's motion in its entirety.

                                      Respectfully Submitted,

                                      JAMES L. LEE
                                      Deputy General Counsel

                                      GWENDOLYN YOUNG REAMS
                                      Associate General Counsel

                                      DELNER FRANKLIN-THOMAS
                                      Regional Attorney

                                      s/ Carla J. Von Greiff
                                      CARLA J. VON GREIFF
                                      Florida Bar No. 0110566
                                      Senior Trial Attorney
                                      EQUAL EMPLOYMENT
                                      OPPORTUNITY COMMISSION
                                      501 East Polk Street, Suite 1000
                                      Tampa, Florida 33602
                                      Tel. (813) 228-2020
                                      Fax (813) 228-2045

---

[10] In its motion, Defendant states that Rylance "admits" she drew unemployment compensation, however, this fact is irrelevant to the analysis of her entitlement to back pay because unemployment compensation benefits are not deductable from back pay awards. *See Dominguez v. Tom James Co.* 113 F.3d 1188, 1189 (11th Cir. 1997); *Brown v. A.J. Gerrard Mfg. Co.* 715 F.2d 1549, 1550-51(11th Cir. 1983).

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 4th day of October 2005, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

| | |
|---|---|
| Peter Reed Corbin, Esquire<br>Ford & Harrison, LLP<br>225 Water Street, Suite 710<br>Jacksonville, FL 32202<br>pcorbin@fordharrison.com | Kelly H. Chanfrau, Esquire<br>Ford & Harrison, LLP<br>101 East Kennedy Boulevard, Suite 900<br>Tampa, FL 33602<br>kchanfrau@fordharrison.com |

                                                                            s/ Carla J. Von Greiff